IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **GEORGE P. GOODMAN, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| -vs- ) | Civil No. 03-202-WDS |
| ) | |
| **DONALD N. SNYDER, et al.** ) | |
| ) | |
| **Defendants.** ) | |

**REPORT AND RECOMMENDATION**

**FRAZIER, Magistrate Judge:**

Before the Court are plaintiff's motion for partial summary judgment (Doc. No. 62), defendant Walker and Hinsley's motion for partial dismissal (Doc. No. 69), and defendant Walker, Hinsley, McAdory, Maue, Keim, and Gross' cross-motion for summary judgment (pt. of Doc. No. 73).

Plaintiff challenges the conditions of his confinement at Menard Correctional Center, alleging that he was deprived of his First and Fourteenth Amendment right to freely exercise his religion, his Fourteenth Amendment right of access to the Courts, and his statutory right under the Religious Land Use and Institutionalized Persons Act (RLUIPA). Plaintiff seeks monetary and injunctive relief (Doc. No. 42).

**Motion to Dismiss**

Defendants Walker and Hinsley seek an order dismissing Count II, which alleges a deprivation of plaintiff's Fourteenth Amendment right to access to the courts (Doc. No. 69). These defendants admit that plaintiff has a right of access to the courts but argue that his allegations do not describe a deprivation of that right. The motion is unopposed.

Defendants Walker and Hinsley are named only in Count III. The only relief requested from

these defendants is injunctive relief pertaining to Count III. Count II does not name defendant Walker or Hinsley and does not attribute any conduct to these defendants. Plaintiff does not seek any relief from these defendants for the alleged deprivation of access to the courts. Because the access to courts claim is not asserted against defendant Walker or Hinsley, their motion to dismiss Count II is moot.

## Motions for Summary Judgment

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To determine whether there is a genuine issue of material fact, the Court will construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### I.     First Amendment Claim

Plaintiff seeks judgment in his favor on his claim that the defendants violated his right to freely exercise his religion by confiscating his pentacle medallion, a symbol of his religious beliefs. Plaintiff argues that the evidence demonstrates that the defendants made an arbitrary decision to confiscate his medallion. Specifically, he argues that his medallion does not violate prison rules or present a legitimate security threat.

The materials on file show that plaintiff adheres to the Wicca faith. Prison officials have acknowledged plaintiff's affiliation with Wicca since 1999. Regulations governing facilities operated by the Illinois Department of Corrections Prison permit inmates to obtain religious symbols

which represent their faith. However, access to religious symbols may be restricted based on the basis of concerns regarding safety, security, rehabilitation, institutional order, space, resources, or facilitation of gang identification, recruitment, or activity. 20 Ill. Admin. Rules § 425.90(c). In particular, religious symbols may not exceed two inches in height or width. 20 Ill. Admin. Rules § 425.90(c)(2).

Plaintiff owns a silver pentacle medallion, which he considers as both a protective religious item and symbolic of his faith. In 2000, plaintiff asked prison officials to accommodate his religious needs. In connection with this request, senior prison chaplains approved plaintiff's pentacle as a religious article. Plaintiff openly wore the medallion at Stateville Correctional Center, a maximum security facility.

In November, 2001, a correctional employee confiscated plaintiff's medallion. The medallion was returned to plaintiff in January, 2002.

In December, 2002, plaintiff was transferred from Stateville Correctional Center to Dixon Correctional Center. In February, 2002, a religious medallion was sent to plaintiff at Dixon Correctional Center. The prison chaplain gave his approval, and plaintiff wore his medallion at Dixon Correctional Center without encountering hostility from other inmates.

Plaintiff was transferred from Dixon Correctional Center to Menard Correctional Center on September 12, 2002. The following day, plaintiff's medallion was confiscated by personal property officers. Notes on personal property forms suggest that defendants Keim and Maue made the decision. The medallion measures one and 3/16 inches in diameter. Inmates at Menard who adhere to different religious faiths are allowed to possess and wear medallions having religious significance.

On September 24, 2002, plaintiff was transferred from Menard Correctional Center to

Pontiac Correctional Center, a maximum security institution. The pentacle was returned to plaintiff at the time of the transfer.

On September 30, 2002, plaintiff was transferred from Pontiac Correctional Center to Menard Correctional Center. The pentacle was confiscated on plaintiff's return.

In August, 2003, the Administrative Review Board (ARB) resolved plaintiff's grievance, finding that Menard Correctional Center had acted in accordance with the policy permitting regulation of religious items. However, the ARB instructed Menard Correctional Center to "ensure appropriate policy is followed," pointing to the rule limiting religious symbols to two inches in height or width. The Director of the Illinois Department of Corrections agreed with the ARB's recommendation and instructed defendant McAdory to proceed accordingly. Defendant McAdory was the warden at Menard Correctional Center at that time.

In June, 2004, Charles Hinsley, then the warden at Menard Correctional Center, issued a bulletin describing a change in policy regarding inmate attire. Effective July 1, 2004, inmates would be required to wear certain clothing, including blue shirts buttoned up to the button directly below the collar button. Also effective in July, 2004, an institutional directive at Menard limited the size of personal religious symbols to medallions not exceeding one inch in diameter.

Defendant Keim works as a chaplain at Menard Correctional Center. He has educated himself about the tenets of various religions, including the Wiccan faith. Keim does not believe possession of a pentagram plays a significant role in a person's ability to practice Wicca. Rather, Keim believes a practicing Wiccan may fulfill the tenets of his or her faith without possessing a pentagram. He also believes that another symbol, known as a triskel, could be a substitute for a pentagram. Keim states that five-pointed and six-pointed stars are not permitted at Menard

Correctional Center because they represent gang alliances known as the "People" and the "Folks," respectively.

Keim's opinion has some support in the record.[1] However, the materials submitted show that the Wiccan religion exists in various forms, with many different traditions, practices, and philosophies. In general, Wiccans associate five elements of nature (earth, air, fire, water, spirit) with sacred directions which "form a standard framework" that symbolizes spiritual beliefs, teachings and practice. (Doc. No. 78, Ex. C-1, pp. 12). The pentacle is "universally recognized" as "the symbol of Wicca" and usually becomes an important personal religious item that symbolizes religious dedication and may be perceived as having protective and healing energy (Doc. No. 78, Ex. C-1, pp. 2, 12; Ex. C-2, p. 12; Ex. C-3, p. 3).

Josef Wehlauch, a correctional employee who trains officer cadets, states that some inmates use certain symbols to show membership or affiliation with gangs and other violent groups, known to prison officials as security threat groups or STGs. The five-pointed star is commonly used to symbolize membership or affiliation with groups collectively known as "People." While individuals linked to the "People" are historically African-American, Wehlauch believes Caucasian members are becoming more prevalent. In Wehlauch's opinion, STGs are present at all facilities in the Illinois Department of Corrections but are particularly pervasive at high level facilities, such as Menard Correctional Center. Wehlauch believes that inmate possession of a medallion with a five-pointed star would present a risk of violent retribution and disruption of prison goals.

James Baucrsachs works for the Illinois Department of Corrections as an intelligence officer

---

[1] Keim's opinion that a triskel might serve as an adequate substitute symbol of plaintiff's faith appears to be based on anonymous statements in the "Paganism in Prison" section of a draft chaplaincy manual of corrections services in Canada. No evidence suggests that the triskel is relevant to plaintiff's beliefs.

at Menard Correctional Center. As part of his duties, he evaluates STGs. In his opinion, some of the violent incidents that occur between inmates at Menard on a regular basis can be attributed to STGs. These incidents are pervasive at Menard, where approximately 21% of the inmate population is affiliated with the "People" and approximately 26% of the inmate population is affiliated with the "Folks." Baucrsacks states that the five pointed star is one of the primary identification symbols used by the "People." Disputes between members of rival gangs often lead to violence and disruption. In 2004, inmates at Menard were accused of violating disciplinary rules by engaging in gang activity 54 times in a five-month period. In Baucrsachs' opinion, a decision to allow an inmate to wear a medallion with a five-pointed star could put that inmate in danger of retaliation by a member of the "People" or "Folks," destabilize the prison, and encourage inmate members of the "People" to make false claims that their religion also requires them to wear a five-pointed star. Baucrsachs' affidavit is supported by records demonstrating that violence between inmates affiliated with street gangs cause injuries and disrupt the security of the facility.

William Spiller is a long-term employee of Menard Correctional Center. He reports that prison officials at that facility revised institutional policy and limited the size of religious medallions to a diameter up to one-inch in 1996. The decision was intended to minimize the influence of gangs by reducing the visibility of symbols that may be used as gang identifiers and reduce the potential for use of a religious medallion as a weapon. Spiller reports that medallions have been sharpened by inmates and can be used to injure other inmates, staff, or the inmate himself. Because medallions smaller than one inch are more difficult for a grown man to grasp, they are less attractive as potential weapons and less effective when used as weapons. Spiller reports that Menard's one-inch size limitation predates the two-inch restriction set forth in the Department's regulations.

Inmates retain a limited right to exercise religious beliefs in prison. When a prison

regulation impinges on this right, the regulation is valid if it is reasonably related to legitimate penological interests. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Turner v. Safley*, 482 U.S. 78, 89 (1987). To determine the reasonableness of the prison regulation, courts examine these four factors: (1) whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule; (2) whether there are alternative means of exercising the right in question that remain available to prisoner; (3) whether accommodation of the asserted constitutional right will have negative effects on guards, other inmates or prison resources; and (4) whether there are obvious, easy alternatives at a de minimus cost. *Turner*, 482 U.S. at 89-91. Prison officials are routinely afforded wide-ranging deference in determining what steps are necessary to preserve order. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

The defendants promote two legitimate interests: restricting gang symbolism and regulating the size of medallions. Both are discussed below.

A. <u>Restricting Gang Symbolism</u>. Prison officials have a legitimate interest in limiting gang activity, which often leads to violence and disrupts prison security. Plaintiff's pentacle medallion could be used to communicate gang allegiance and could also be perceived by others as representing gang affiliation or membership. A decision to restrict plaintiff's access to his medallion has a valid, rational connection to the legitimate interest of preventing gang activity in prison.[2] The first factor is satisfied. Plaintiff could wear a medallion displaying a different symbol; however, evidence linking plaintiff's religious beliefs to a substitute symbol is lacking. While the materials on file suggest that Wiccans in general use an assortment of personal religious items, such as religious literature, tarot cards, sea salt, and incense, the evidence does not show that plaintiff has frequent

---

[2] As plaintiff points out, the defendants recently obtained evidence suggesting that plaintiff's medallion could be confused with gang insignia. It is less than clear that this rationale was actually a basis for their decision to confiscate plaintiff's religious medallion.

access to personal religious items at Menard Correctional Center. Hence, the Court has insufficient evidence to determine whether plaintiff has alternative methods of exercising his religious beliefs.[3] The impact of accommodating plaintiff's right to exercise his religious beliefs on staff and other inmates and prison resources appears to be minimal, considering the small size of plaintiff's medallion (smaller than the size restriction approved by the Illinois Department of Corrections); the current dress code at Menard Correctional Center, which would prevent other inmates from viewing or recognizing the symbol on plaintiff's medallion in most circumstances; the fact that gang violence is a problem throughout the Department of Corrections, yet plaintiff wore his medallion at several other institutions – including maximum security facilities – for long periods without incident; and the slim chance that plaintiff, who is Caucasian, would be mistaken for an associate of the "People." The third factor is not satisfied. Finally, ready alternatives are available. The current dress code significantly limits the extent to which inmates can use medallion symbols to communicate gang identity. By adopting a dress code, prison officials at Menard Correctional Center have found an easy, available alternative to banning ownership of a personal religious medallion. The fourth factor is not satisfied.

  B. <u>Regulating Medallion Size</u>. Prison officials have a legitimate interest in preventing inmates from harming themselves and others. Restricting medallions to a small size is rationally related to this objective, as small medallions are less likely to be used effectively as weapons. The first factor is satisfied. There is no evidence on the second factor. The impact of accommodating plaintiff's right by permitting him to possess a medallion with a diameter slightly larger than one inch appears to be minimal. The medallion at issue was approved at other institutions in the state, based on a policy adopted by the Illinois Department of Corrections. This suggests that a medallion

---

[3] At a hearing held in September, 2004, plaintiff described restricted access to tarot cards.

slightly larger than one inch would not have a significant impact on staff, other inmates or prison resources. An easy alternative exists, as the Director of the Illinois Department of Corrections has determined that a 2-inch size restriction is appropriate and has instructed defendant McAdory to follow that policy.

In sum, the evidence presented satisfies some, but not all of the *Turner* factors. The factors are fairly evenly divided, producing no clear winner. Under these circumstances, neither the plaintiff nor the defendants are entitled to judgment in their favor on plaintiff's First Amendment claim. **II.    Religious Land Use and Institutionalized Persons Act Claim.**

In order to succeed on his RLUIPA claim, plaintiff must show that he is confined in a state prison that receives federal funds and that his exercise of religion is substantially burdened. The defendants can defeat this claim with evidence that the restriction furthers a compelling governmental interest and is the least restrictive means to further that interest. 42 U.S.C. § 2000cc-1(a).

Plaintiff argues that the evidence shows that the defendants have substantially burdened his free exercise of religion. The defendants disagree. Their position is that plaintiff must present evidence that the restriction on his efforts to exercise his beliefs interferes with a tenet or belief that is central to his faith. The defendants are mistaken. An inquiry into whether possession of a pentacle medallion is "central" to plaintiff's religion is barred by RLUIPA. 42 U.S.C. § 2000cc-5(7). The term "religious exercise" includes any exercise of religion, whether or not compelled by or central to a system of religious belief. *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003). The evidence, outlined above, shows that plaintiff's beliefs are sincere and deeply held. He attaches religious significance to possession of his pentacle medallion. The complete deprivation of this religious item is a substantial burden on religious exercise.

9

The defendants also argue that they have a compelling interest in denying inmate access to a pentacle medallion, since it is easily perceived as a symbol of alliance with the "People." It is undisputed that the goal of maintaining prison security by suppressing gang activity is a compelling state interest. *See Cutter v. Wilkinson*, __ U.S. __, 125 S.Ct 2113, 2124 n. 13 (2005).

The defendants also argue that an absolute ban against plaintiff's religious pentacle is the least restrictive means to achieve the compelling interest of maintaining prison security. Plaintiff disagrees, observing that he has had possession of his pentacle in prison for considerable periods of time without incident. He suggests that a complete deprivation is an exaggerated response to the legitimate security concerns.

On this issue, the burden is on the defendants. They have not satisfied their burden. Less restrictive alternatives to a ban on pentacle medallions are available. For example, the defendants may allow plaintiff to possess his religious medallion and restrict his ability to display the symbol to other inmates. They may order plaintiff to keep his pentacle out of sight at all times. They may enforce their current dress code and require plaintiff to wear his pentacle medallion under his shirt whenever he leaves his cell, or they may direct plaintiff to wear the symbol against his skin so it is not visible. They may restrict the size of the pentacle symbol, so that it will not be noticed and mistaken for gang insignia. All of these options are available to the defendants.

In sum, viewing the evidence in defendants' favor, plaintiff has demonstrated a violation of RLUIPA.

### III.   Equal Protection

Plaintiff argues that he is entitled to judgment in his favor on a claim that he was subjected to discrimination in violation of his right to equal protection of the law, pointing to assertions that

other inmates are allowed to wear personal items having religious significance. A fatal flaw to this argument is that an equal protection claim has not been alleged. Plaintiff's equal protection argument is not evaluated.

### IV.    Defenses

Plaintiff argues that defenses based on Eleventh Amendment and qualified immunity lack legal and factual support. These arguments are unopposed. Because the defenses were not offered to defeat judgment in plaintiff's favor, they are not addressed. *Kramer v. Banc of Am. Sec.*, LLC, 355 F.3d 961, 964 n. 1 (7th Cir. 2004)(Failure to develop an argument constitutes a waiver).

### V.    Conclusion

IT IS RECOMMENDED that plaintiff's motion for summary judgment (Doc. No. 62) be GRANTED in part and DENIED in part. Judgment should enter in plaintiff's favor and against defendants Walker, Hinsley, Maue, Keim, and Gross on Count III, which asserts a violation of RLUIPA, at the conclusion of this case. Because issues remain for decision, relief should be determined and awarded at trial.

IT IS FURTHER RECOMMENDED that defendant Walker and Hinsley's motion for partial dismissal (Doc. No. 69) be DENIED as moot.

IT IS FURTHER RECOMMENDED that the cross-motion for summary judgment filed by defendants Walker, Hinsley, McAdory, Maue, Keim, and Gross (pt. of Doc. No. 73) be DENIED.

SUBMITTED:   February 13, 2006  .

*s/Philip M. Frazier*
**PHILIP M. FRAZIER**
**UNITED STATES MAGISTRATE JUDGE**