IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GEORGE P. GOODMAN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 03-202-WDS |
| | ) | |
| DONALD N. SNYDER, EUGENE | ) | |
| McADORY, TOM MAUR, STEVE | ) | |
| KEIM, MAVIS GROSS, and LATOYA | ) | |
| OWENS, | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM & ORDER

**STIEHL, District Judge:**

Before the Court is the Report and Recommendation of United States Magistrate Judge Philip M. Frazier, that plaintiff's motion for partial summary judgment be granted in part and denied in part, that defendants Walker, Hinsley, McAdory, Keim, and Gross' cross-motion for summary judgment be denied, and that defendants Walker and Hinsley's motion for partial dismissal be denied as moot. Defendants have filed objections to the magistrate judge's recommendation that plaintiff's motion for partial summary judgment be granted in part; pursuant to 28 U.S.C. § 636(b)(1), the Court will review *de novo* those portions of the recommendation to which specific written objections have been made.

In this action, plaintiff challenges the conditions of his confinement at Menard Correctional Center. Specifically, plaintiff alleges that: defendants violated his constitutional right to freely exercise his religion under the First and Fourteenth Amendments by confiscating his pentacle medallion, a symbol of his religious beliefs (Count I); defendants violated his rights under the Fourteenth Amendment by denying him access to the courts (Count II); and that

defendants Walker, Hinsley, Maue, Keim, and Gross violated his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et al.* (Count III).

The magistrate judge recommends that plaintiff's motion for partial summary judgment be granted with respect to his RLUIPA claim and denied as to the remainder. The magistrate judge further recommends that defendants' cross-motion for summary judgment be denied and that Hinsley and Walker's motion for partial dismissal be denied as moot. Defendants object to the recommendations that plaintiff's motion for partial summary judgment be granted on the RLUIPA claim and that defenses based on qualified immunity and the Eleventh Amendment be denied; therefore, the Court will review those issues only.

Plaintiff's RLUIPA claim arises from the following facts, as excerpted from the magistrate judge's report and recommendation:

> [P]laintiff adheres to the Wicca faith. Prison officials have acknowledged plaintiff's affiliation with Wicca since 1999. Regulations governing facilities operated by the Illinois Department of Corrections Prison permit inmates to obtain religious symbols which represent their faith. However, access to religious symbols may be restricted based on the basis of concerns regarding safety, security, rehabilitation, institutional order, space, resources, or facilitation of gang identification, recruitment, or activity. 20 Ill. Admin. Rules § 425.90(c). In particular, religious symbols may not exceed two inches in height or width. 20 Ill. Admin. Rules § 425.90(c)(2).

> Plaintiff owns a silver pentacle medallion, which he considers as both a protective religious item and symbolic of his faith. In 2000, plaintiff asked prison officials to accommodate his religious needs. In connection with this request, senior prison chaplains approved plaintiff's pentacle as a religious article. Plaintiff openly wore the medallion at Stateville Correctional Center, a maximum security facility.

> In November, 2001, a correctional employee confiscated plaintiff's medallion. The medallion was returned to plaintiff in January, 2002.

> In December, 2002, plaintiff was transferred from Stateville Correctional

Center to Dixon Correctional Center. In February, 2002, a religious medallion was sent to plaintiff at Dixon Correctional Center. The prison chaplain gave his approval, and plaintiff wore his medallion at Dixon Correctional Center without encountering hostility from other inmates.

Plaintiff was transferred from Dixon Correctional Center to Menard Correctional Center on September 12, 2002. The following day, plaintiff's medallion was confiscated by personal property officers. Notes on personal property forms suggest that defendants Keim and Maue made the decision. The medallion measures one and 3/16 inches in diameter. Inmates at Menard who adhere to different religious faiths are allowed to possess and wear medallions having religious significance.

On September 24, 2002, plaintiff was transferred from Menard Correctional Center to Pontiac Correctional Center, a maximum security institution. The pentacle was returned to plaintiff at the time of the transfer.

On September 30, 2002, plaintiff was transferred from Pontiac Correctional Center to Menard Correctional Center. The pentacle was confiscated on plaintiff's return.

In August, 2003, the Administrative Review Board (ARB) resolved plaintiff's grievance, finding that Menard Correctional Center had acted in accordance with the policy permitting regulation of religious items. However, the ARB instructed Menard Correctional Center to "ensure appropriate policy is followed," pointing to the rule limiting religious symbols to two inches in height or width. The Director of the Illinois Department of Corrections agreed with the ARB's recommendation and instructed defendant McAdory to proceed accordingly. Defendant McAdory was the warden at Menard Correctional Center at that time.

In June, 2004, Charles Hinsley, then the warden at Menard Correctional Center, issued a bulletin describing a change in policy regarding inmate attire. Effective July 1, 2004, inmates would be required to wear certain clothing, including blue shirts buttoned up to the button directly below the collar button. Also effective in July, 2004, an institutional directive at Menard limited the size of personal religious symbols to medallions not exceeding one inch in diameter.

Defendant Keim works as a chaplain at Menard Correctional Center. He has educated himself about the tenets of various religions, including the Wiccan faith. Keim does not believe possession of a pentagram plays a significant role in a person's ability to practice Wicca. Rather, Keim

- 3 -

believes a practicing Wiccan may fulfill the tenets of his or her faith without possessing a pentagram. He also believes that another symbol, known as a triskel, could be a substitute for a pentagram. Keim states that five-pointed and six-pointed stars are not permitted at Menard Correctional Center because they represent gang alliances known as the "People" and the "Folks," respectively.

....  However, the materials submitted show that the Wiccan religion exists in various forms, with many different traditions, practices, and philosophies. In general, Wiccans associate five elements of nature (earth, air, fire, water, spirit) with sacred directions which "form a standard framework" that symbolizes spiritual beliefs, teachings and practice. (Doc. No. 78, Ex. C-1, pp. 12). The pentacle is "universally recognized" as "the symbol of Wicca" and usually becomes an important personal religious item that symbolizes religious dedication and may be perceived as having protective and healing energy (Doc. No. 78, Ex. C-1, pp. 2, 12; Ex. C-2, p. 12; Ex. C-3, p. 3).

Josef Wehlauch, a correctional employee who trains officer cadets, states that some inmates use certain symbols to show membership or affiliation with gangs and other violent groups, known to prison officials as security threat groups or STGs. The five-pointed star is commonly used to symbolize membership or affiliation with groups collectively known as "People." While individuals linked to the "People" are historically African-American, Wehlauch believes Caucasian members are becoming more prevalent. In Wehlauch's opinion, STGs are present at all facilities in the Illinois Department of Corrections but are particularly pervasive at high level facilities, such as Menard Correctional Center. Wehlauch believes that inmate possession of a medallion with a five-pointed star would present a risk of violent retribution and disruption of prison goals.

James Baucrsachs works for the Illinois Department of Corrections as an intelligence officer at Menard Correctional Center. As part of his duties, he evaluates STGs. In his opinion, some of the violent incidents that occur between inmates at Menard on a regular basis can be attributed to STGs. These incidents are pervasive at Menard, where approximately 21% of the inmate population is affiliated with the "People" and approximately 26% of the inmate population is affiliated with the "Folks." Baucrsacks states that the five pointed star is one of the primary identification symbols used by the "People." Disputes between members of rival gangs often lead to violence and disruption. In 2004, inmates at Menard were accused of violating disciplinary rules by engaging in gang activity 54 times in a five-month period. In Baucrsachs' opinion, a decision to allow an inmate to wear a medallion with a five-pointed star could put that inmate in danger

of retaliation by a member of the "People" or "Folks," destabilize the prison, and encourage inmate members of the "People" to make false claims that their religion also requires them to wear a five-pointed star. Baucrsachs' affidavit is supported by records demonstrating that violence between inmates affiliated with street gangs cause injuries and disrupt the security of the facility.

William Spiller is a long-term employee of Menard Correctional Center. He reports that prison officials at that facility revised institutional policy and limited the size of religious medallions to a diameter up to one-inch in 1996. The decision was intended to minimize the influence of gangs by reducing the visibility of symbols that may be used as gang identifiers and reduce the potential for use of a religious medallion as a weapon. Spiller reports that medallions have been sharpened by inmates and can be used to injure other inmates, staff, or the inmate himself. Because medallions smaller than one inch are more difficult for a grown man to grasp, they are less attractive as potential weapons and less effective when used as weapons.

(Doc. 102, pp. 2-6).

Defendants do not dispute the facts as set forth above. In order to succeed on his RLUIPA claim, plaintiff must demonstrate that he is confined in a state prison that receives federal funds and that his exercise of religion is substantially burdened.  The defendants can defeat this claim by showing that the imposition of the burden on plaintiff is: (1)  in furtherance of a compelling governmental interest; and (2)  the least restrictive means of furthering that compelling governmental interest. 42 U.S.C.§ 2000cc-1(a).

Here, the magistrate judge rejected defendants' argument that plaintiff must present evidence that the restriction on his efforts to exercise his beliefs interferes with a tenet that is central to his faith.  The magistrate judge cited *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir 2003) for the proposition that "religious exercise" includes any exercise of religion whether or not it is central to a system of religious belief.  The magistrate judge further concluded that plaintiff's religious beliefs are deeply and sincerely held,

- 5 -

and that complete deprivation of the pentacle constitutes a substantial burden on religious exercise.

The magistrate judge, while recognizing that the goal of maintaining prison security by suppressing gang activity is a compelling state interest, rejected defendants' argument that an absolute ban on plaintiff's religious pentacle is the least restrictive means to achieve the compelling interest of maintaining prison security by denying inmate access to a pentacle medallion that is easily perceived as a symbol of alliance with the "People." He concluded that a complete deprivation is an exaggerated response to the legitimate security concerns, and that less restrictive alternatives to a ban on pentacle medallions are available, for example, the defendants may allow plaintiff to possess his religious medallion and restrict his ability to display the symbol to other inmates, or order plaintiff to keep his pentacle out of sight at all times, or enforce their current dress code and require plaintiff to wear his pentacle medallion under his shirt whenever he leaves his cell, or direct plaintiff to wear the symbol against his skin so it is not visible. The magistrate judge ultimately concluded that plaintiff has demonstrated a RLUIPA violation.

Defendants object to the finding that they have failed to satisfy their burden that confiscating the pentacle was the least restrictive means of achieving its compelling interest of safety and security within the prison. Defendants claim that the less restrictive means suggested by the magistrate judge do not achieve the same goals that defendants seek to achieve. They claim that the magistrate judge's suggestions "may lessen, even drastically so, the effects of the plaintiff's pentacle, however they fall short of achieving the sole and vital goal of alleviating the effect of the plaintiff's pentacle completely" and that "[p]romulgating and enforcing rules that

prohibit an inmate from ever displaying his religious symbol that ubiquitously doubles as a notorious gang symbol does, in a vacuum, prevent the effect of said symbol; however, the harsh reality is rules are often willingly broken." Defendants also assert that the magistrate judge did not take into account the prison's size restriction on religious symbols within the context of the RLUIPA.

Upon review, the Court overrules defendants' objections. As the magistrate judge notes, the size of plaintiff's medallion was approved at other institutions throughout the state, based on a policy adopted by the IDOC. It is only slightly larger than the recent one-inch limit placed on such symbols by Menard Correctional Center. Moreover, plaintiff wore his medallion at other institutions for long periods without incident. Further, the Court notes that it is somewhat unlikely that plaintiff's medallion would link him to the "People," as plaintiff is Caucasian and the "People" are historically African-American. Finally, the Court finds that there are several alternatives less restrictive than an outright prohibition on plaintiff's pentacle to promote prison safety and security, as outlined above.

Defendants also take issue with the magistrate judge's finding that defenses based on qualified immunity and the Eleventh Amendment be denied. Specifically, the report and recommendation states:

> Plaintiff argues that defenses based on Eleventh Amendment and qualified immunity lack legal and factual support. These arguments are unopposed. Because the defenses were not offered to defeat judgment in plaintiff's favor, they are not addressed. *Kramer v. Banc of Am. Sec*., LLC, 355 F.3d 961, 964 n. 1 (7th Cir. 2004) (Failure to develop an argument constitutes a waiver).

(Doc. 102, p. 11).

In response, defendants essentially assert that plaintiff failed to set forth specific facts and

- 7 -

law that would foreclose qualified immunity at this juncture, and that his qualified immunity and Eleventh Amendment arguments were not in fact unopposed as demonstrated by the filing of defendants' cross-motion for summary judgment.  Merely filing a response or a motion, however, does not demonstrate opposition to a specific argument or claim.  There is no dispute that, despite the fact that plaintiff did raise and substantially address the inapplicability of defenses based on qualified immunity and the Eleventh Amendment in his motion for partial summary judgment, defendants failed to address either qualified immunity or the Eleventh Amendment in their response and cross-motion for summary judgment.

As other district courts have noted:

> This Court is not obligated to construct arguments regarding the Defendants' affirmative defenses on their behalf. See, e.g., *Edward E. Gillen Co.* [*v. City of Lake Forest*], 3 F.3d [192] at 196 [7th Cir. 1992]. "A summary judgment on the issue of liability encompasses all affirmative defenses and implicitly challenges the non-movant to establish a basis for finding that the defenses are both applicable and supported by sufficient facts." *The Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 796 F. Supp. 1164, 1167 (S.D. Ind.1992); accord, e.g., *Midwest Oilseeds, Inc. v. Limagrain Genetics Corp*., 387 F.3d 705, 714 (8th Cir.2004); *Alexander v. Unlimited Progress Corp*., No. 02-2063, 2004 WL 2384645, at *4 (N.D. Ill. Oct.20, 2004); see also *Apollo Galileo USA P'ship v. Kingdom Vacations, Inc*., No. 01-6847, 2002 WL 1359391, at *3 n. 1 (N.D. Ill. June 20, 2002) (affirmative defenses that are not raised by the nonmovant in response to a summary judgment motion are waived).

*Ramada Franchise Systems, Inc. v. Royal Vale Hospitality of Cincinnati, Inc.*, 2005 WL 435263, at *10 (N.D. Ill. Feb. 16, 2005).  Accordingly, the Court will not now consider defendants' arguments with respect to qualified immunity and the Eleventh Amendment.

Based on the foregoing, the Court **OVERRULES** defendants' objections and **ADOPTS** the Report and Recommendation (Doc. 102).  Plaintiff's motion for partial summary judgment (Doc. 62) is **GRANTED** with respect to Count III against defendants Walker, Hinsley, Maue,

Keim, and Gross, and **DENIED** on all other grounds. Defendants' cross-motion for summary

judgment (Doc. 73) is **DENIED** and defendants Walker and Hinsley's motion for partial

dismissal (Doc. 69) is **DENIED** as moot.


      **IT IS SO ORDERED.**

      **DATED:   March 8, 2006.**


                                            **s/ WILLIAM D. STIEHL**
                                            **DISTRICT JUDGE**